[Cite as *In re J.G.*, 2022-Ohio-827.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE J.G., ET AL.

Minor Children

[Appeal by T.G., Mother]

:
:
:
:
:
:

No. 110745

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 17, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-18910052, AD-18910053, AD-18910054, and AD-18910055

---

### *Appearances:*

Christina M. Joliat, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Anthony R. Beery, Assistant Prosecuting Attorney, *for appellee.*

EMANUELLA D. GROVES, J.:

{¶ 1} Appellant-Mother, T.G. ("Mother"), appeals from the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division ("juvenile court") that granted permanent custody of her children, N.G. (d.o.b. February 14, 2017) and H.B. (d.o.b. July 31, 2018), to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Mother also appeals from the judgment of the

juvenile court that granted legal custody of her children, J.G. (d.o.b. March 2, 2013) and J.L. (d.o.b. July 2, 2014) to M.L., the paternal grandmother of J.L.  For the reasons set forth below, we affirm the decisions of the juvenile court.

**Factual and Procedural History**

{¶ 2}  On August 9, 2018, the agency filed a complaint alleging dependency and requesting protective supervision of the four children.  The complaint made a number of allegations, including that Mother had a substance-abuse disorder.  The basis for that allegation was that Mother tested positive for marijuana at the July 31, 2018 birth of H.B. and at the February 14, 2017 birth of N.G.  The agency had offered Mother services but she had failed to engage.  The complaint also alleged that the alleged father of N.G. and H.B., H.B. Sr. ("Father,")[1] physically assaulted Mother while pregnant.  Father was charged with domestic violence and menacing by stalking; however, those charges were dismissed because Mother refused to cooperate with the prosecution.  The complaint further alleged that Mother had mental-health issues that interfered with her ability to provide a safe home for the children and that she had not consistently followed through with treatment.  Finally, the complaint alleged that J.G. and J.L. had previously been adjudicated abused and dependent due in part to Mother's mental-health issues and violence in the home.  Those children had previously been under the protective supervision of the agency in 2015.

---

[1] Neither J.L.'s father or J.G.'s father is part of this litigation; therefore, unless otherwise noted, "Father" refers to the father of H.B. and N.G.  Both J.L.'s and J.G.'s fathers are deceased.

{¶ 3} On August 22-23, 2018, the agency filed a motion for predispositional temporary custody of the children, as well as a motion to amend the complaint from a request for protective supervision to a request for temporary custody.

{¶ 4} The agency filed a second motion for predispositional temporary custody on October 31, 2018, for the children N.G. and H.B. The agency alleged that Mother had had a mental-health crisis and that a safety plan put in place to address those issues was not working. They also alleged that there had been domestic violence in the home. At the time, neither parent was engaged in services to address the domestic violence issues.

{¶ 5} The juvenile court granted predispositional temporary custody to the agency of all four children on November 8, 2018.

{¶ 6} At an adjudicatory hearing on March 13, 2019, Mother admitted to an amended complaint that alleged marijuana substance abuse, failure to treat her mental-health issues, continued contact with Father, a domestic abuser, and the existence of dismissed domestic violence and menacing by stalking charges against Father. Based on the admission, the juvenile court adjudicated the children to be dependent.

{¶ 7} On March 21, 2019, Mother filed a motion requesting legal custody of the children with court-ordered protective supervision. On August 20, 2019, the agency filed a motion to modify temporary custody to permanent custody. A trial was held in November 2019, and the trial court terminated Mother's parental rights to all four children granting permanent custody to the agency. Mother appealed that

decision in January 2020. On September 3, 2020, we issued our decision reversing the decision of the juvenile court. *In re J.G.*, 8th Dist. Cuyahoga No. 109357, 2020-Ohio-4304 ("*J.G. I*"). We found that the trial court's findings under the first prong of the permanent custody analysis under R.C. 2151.414(B) were not supported by competent, credible evidence. We also found that permanent custody was not in the best interest of the children, because "the record does not contain competent credible evidence demonstrating the existence of any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e)." *Id.* at ¶ 43.

{¶ 8} On November 5, 2020, pursuant to this court's order, the juvenile court reinstated temporary custody for the children. The juvenile court continued the case to December 8, 2020, for a hearing to determine how much additional time should be extended to allow Mother and/or Father to complete the case plan. After describing the procedural history through the appeal, the juvenile court, through a magistrate, found as follows:

> The children J.G. and J.L. have now been involved with CCDCFS for approximately 5 years. CCDCFS was involved with the children in 2015 with a formal filing and again in 2017 informally wherein CCDCFS continued to offer Mother services. CCDCFS was again formally involved in 2018 with the children and additional children in the case now before the court.
>
> In this iteration of CCDCFS involvement, the children have now been in the care and custody of CCDCFS since November 7, 2018 which at this point is in excess of 2 years, well over twelve of a consecutive twenty-two-month period.
>
> Mother has been provided approximately 11 additional months since the permanent custody trial to complete case plan services. The children have been in the care and custody of CCDCFS, now, in excess

of the twelve out of twenty-two months identified in 2151.413 that mandates a permanency filing.

Services offered to Mother in furtherance of the case plan goals have been uninterrupted as the Mother has had another child during the pendency of the appeal. That child is court involved under a separate CCDCFS filing.

{¶ 9} The magistrate then ordered the agency to immediately file a motion requesting a modification from temporary custody to permanent custody. The juvenile court approved the decision of the magistrate on December 29, 2020. On December 21, 2020, the agency filed a motion to modify temporary custody to permanent custody for H.B. and N.G. They also filed a motion to modify temporary custody of J.L. and J.G. to legal custody to M.L., J.L.'s paternal grandmother. At the time of these filings, H.B. and N.G. were in foster care placements. J.L. and J.G. were residing with M.L.

{¶ 10} A trial was held in April 2021. During trial, CCDCFS social worker Melanie Green ("Green") testified on behalf of the agency. Green testified that Mother's case plan included substance abuse, mental health, and paternity establishment. The case plan had also included domestic violence services, but Green believed it was removed due to: a) the completion of services by Mother, b) Father's incarceration, and c) Mother's assertions that she was no longer involved with Father.

{¶ 11} Green testified that the agency remained concerned about domestic violence for several reasons. Mother gave birth to a fifth child, N.B., in March 2020. Mother first identified a man as the putative father who was incarcerated for

assaulting another girlfriend. However, it was eventually established that Father, H.B. Sr., is the father of N.B., belying Mother's assertion she was no longer associated with Father. Further, Mother eventually admitted that she was still in contact with Father and would always be because of their shared children.

{¶ 12} With respect to substance-abuse issues, Green testified that Mother had been involved in three different treatment programs during the course of her involvement with the agency. Although she had completed two out of the three programs, Mother continued to test positive for marijuana. As of the date of trial, Mother had reengaged in services, however, she still tested positive for marijuana. Green testified that Mother indicated she was trying to obtain a medical marijuana card to address a diagnosis of post-traumatic stress syndrome ("PTSD"), as well as anxiety and other life stressors.

{¶ 13} As to Mother's mental-health issues, Green testified that Mother was engaged in mental-health services in October 2018 when the children came into custody. Mother stopped going to her original treatment provider when her caseworker left around 2017. She was then referred to Bellefaire for counseling and Signature Health for medication management; however, she was unsuccessfully discharged in the spring of 2019 for lack of compliance. Mother was then referred to Ohio Guidestone, where she was assigned a caseworker to assist her as well as a therapist. Mother did not restart therapy until February 2020.

{¶ 14} Green also expressed concern that she has not seen Mother able to function independently with respect to appointments and scheduling. Green

testified that Mother does okay when assisted by her case manager, but she is inconsistent and does not always follow through. Green was doubtful that Mother's functioning would improve if the children were returned to her care.

**{¶ 15}** Finally, Mother had been inconsistent with visitation. After the agency obtained permanent custody in November 2019, visitation stopped entirely. Pursuant to this court's order in September 2020, visitation was reinstated. Mother had been inconsistent in her visitation. Initial visits were in person, then they were changed to virtual. Between November 2020 and April 2021, Mother attended 15 out of 25 visits.

**{¶ 16}** Green then testified regarding the children. J.G. was diagnosed with PTSD and encopresis (fecal soiling) in relation to PTSD. Green testified that the encopresis was a trauma-based condition, not a medical issue. Green testified that the trauma could have been related to J.G. and J.L. being present in the home when J.L.'s father was murdered, as well as the children being present for other domestic violence incidents. J.G. is receiving therapy as a result. Green testified that Mother would become defensive whenever she tried to discuss J.G.'s diagnosis and potential causes. Mother insisted that J.G.'s issues were medical and not trauma-based. The agency, at Mother's request, sought a second opinion as to J.G.'s diagnoses. Even though that opinion confirmed J.G.'s diagnoses were trauma based, Mother continued to insist J.G. had medical issues.

**{¶ 17}** J.L. has diagnoses of traumatic stress disorder and PTSD and is also engaged in therapy. H.B. receives occupational and physical therapy for speech and

gross motor delay. N.B. has an inactive diagnosis for unspecified trauma disorder; however, she currently has no special needs and receives services as needed.

{¶ 18} Green testified that Mother was given the opportunity to attend treatment appointments with the children, but Mother had not attended any sessions due to transportation issues. This was true, even after the foster mother of H.B. and N.G. moved appointments to Cuyahoga County to make it easier for Mother to attend.

{¶ 19} Green reported that J.G. and J.L. are doing well in M.L.'s home. While J.G. and M.L. are not related, Green noted that they behave like grandmother and grandchild. Although Mother and M.L.'s relationship was strained in the past, Green testified they are in communication now. Green believes M.L. will allow the children and Mother to maintain a relationship. Furthermore, M.L. has developed a relationship with H.B.'s and N.G.'s foster mother, ensuring that the children in her care maintain a relationship with their siblings. Michael Holbrook, the guardian ad litem ("GAL"), reported that the two younger children are well cared for and doing well in their foster placement.

{¶ 20} After the agency completed its case, Mother elected to testify on her own behalf. Mother testified that she has engaged in mental-health services since she was 12 years old. She testified that she was able to maintain sobriety during her most recent pregnancy and tested negative at the birth of N.B. However, Mother also admitted that she often skipped appointments for urinalysis with the agency because she knew she would test positive for marijuana. Mother testified that as of

the date of trial, she had been approved for a medical marijuana card; however, she had not received the official paperwork yet.

{¶ 21} When asked about J.G.'s issues, Mother testified that she was sure it was a medical issue and not based on trauma. Mother claimed to have medical records to confirm this. When asked about possible trauma, Mother testified that her children never saw anything, that whenever something bad happened, her children knew to run and hide in their rooms. At most, Mother testified, her children heard a lot of yelling and screaming, but they never saw anything. Mother further testified as to one specific incident. At that time, she testified the children saw her pick up a knife to protect herself from Father, H.B. Sr., when he was banging on the window and trying to get into the home. However, she denied them seeing anything more than that.

{¶ 22} The juvenile court magistrate hearing the case determined, based on the testimony, that permanent custody to the agency of H.B. and N.G. was appropriate and that legal custody of J.G. and J.L. to M.L. was appropriate. Mother filed objections to the decision of the magistrate, which the state opposed. The juvenile court adopted the decision of the magistrate on July 28, 2021.

{¶ 23} Mother appeals this decision and assigns the following errors for our review.

## Assignment of Error No. 1

The trial court's order granting permanent custody to the agency was not based upon sufficient clear and convincing evidence, was against the manifest weight of the evidence and it erred in finding permanent custody to be in the best interest of the child.

## Assignment of Error No. 2

The trial court's order granting legal custody to the paternal grandmother was not based upon sufficient evidence, was against the manifest weight of the evidence and it erred in finding legal custody to be in the best interest of the children.

## Standard of Proof

{¶ 24} As a preliminary matter, we note that the standard of proof is different for a permanent custody determination versus a legal custody determination. A grant of permanent custody must be supported by clear and convincing evidence, while a grant of legal custody must be supported by a preponderance of the evidence. *In re G.L.*, 8th Dist. Cuyahoga No. 110284, 2021-Ohio-2273, ¶ 36; *In re A.B.,* 8th Dist. Cuyahoga No. 110145, 2021-Ohio-4613, ¶ 30. As the requirements for permanent custody are more rigorous, we will address them first.

## Permanent Custody of H.B. and N.G.

{¶ 25} It is axiomatic that a parent has a fundamental right to raise and care for his or her children. *In re G.L.* at ¶ 35, citing *In re L.M.*, 8th Dist. Cuyahoga No. 106072, 2018-Ohio-963, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28; *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 40. Further, termination of parental rights is "'the family law equivalent of the

death penalty in a criminal case.'" *Id.*, quoting *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, citing *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14.

{¶ 26} We have found that "[a]n appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence." *Id.* at ¶ 36, citing *In re J.M.-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28. Further, "clear and convincing evidence" "is that measure or degree of proof that is more than a 'preponderance of the evidence,' but does not rise to the level of certainty required by the 'beyond a reasonable doubt' standard in criminal cases." *Id.*, quoting *In re K.S.*, 8th Dist. Cuyahoga No. 109928, 2021-Ohio-694, ¶ 15, citing *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 8, citing *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994), citing *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 180-181, 512 N.E.2d 979 (1987). Evidence is clear and convincing when it "'produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'" *Id.*, quoting *In re K.S.* at ¶ 15, citing *In re M.S.* at ¶ 18.

{¶ 27} The termination of parental rights is statutory and governed by R.C. 2151.414. *In re G.L.*, 2021-Ohio-2273, at ¶ 37, citing *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. R.C. 2151.414 sets forth a two-part test to be

applied when deciding whether to award permanent custody to a public children services agency.

**First Prong:  R.C. 2151.414(B)(1)(a)-(e)**

{¶ 28} Under the first prong, the juvenile court must find by clear and convincing evidence one of the following five factors:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 29} The first prong is satisfied if any one of these factors is satisfied. R.C. 2151.414(B)(1); *In re G.L.* at ¶ 39, citing *In re S.S.,* 8th Dist. Cuyahoga No. 109356, 2020-Ohio-3039, ¶ 28, citing *In re L.W.,* 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 30} In this instance, the juvenile court found that both the conditions in R.C. 2151.414(B)(1)(a) and (d) were met when it determined that

> [t]he child is not abandoned or orphaned and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with her parents.

> The child has been in temporary custody of a CCDCFS under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two-month period.

{¶ 31} The children have been in the custody of the agency since November 2018, with temporary custody officially granted in March 2019. Mother argues that despite this fact, she has completed a significant portion of her case plan goals and the children can be placed with her within a reasonable time.

{¶ 32} As we have already noted, having found that subsection (d) was satisfied, no further grounds were required under R.C. 2151.414(B)(1). However, the juvenile court went further and made findings relevant to subsection (a), that the children could not or should not be placed with the parents within a reasonable time. The juvenile court found that

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be removed from the parents, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the children to be removed from the home.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

(3) The parents have demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 33} The agency was granted permanent custody of the children in November 2019 and that order was reversed in September 2020 because competent, credible evidence did not support the juvenile court's finding that Mother had continuously and repeatedly failed to remedy the conditions causing the children to be placed outside the home. To the contrary, we noted that the record reflected that Mother had made progress on case plan goals and Green felt Mother was eager to work and to engage in her case plan. *J.G. I* at ¶ 40. Additionally, the juvenile court found that a parent committed abuse or caused the children to become neglected, contentions that we found were not supported in the record. *Id.* at ¶ 41.

{¶ 34} However, on remand, Green testified that because Mother had another child, N.B., in March 2020, the agency was still involved with Mother and still providing services. Here, Green's testimony established that Mother, although she had made some progress, never fully engaged in, or committed to, the objectives of the case plan. Although Father is not appealing the grant of permanent custody to CCDCFS, the juvenile court found that he was unable to care for the children due to current health issues. Mother testified that he was seriously ill. Furthermore,

Father had not participated in case plan services and had not been consistently visiting.

{¶ 35} Despite having additional time from the last appeal to this one, Mother has not made appreciable strides toward the case-plan objectives. Our review of the record reveals that the juvenile court's findings under the first prong are supported by competent and credible evidence as detailed above. Finding no error with the juvenile court's findings under the first prong, we now consider the court's findings under the second prong.

**Second Prong: R.C. 2151.414(D)**

{¶ 36} Under the second prong, the juvenile court must find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child. *In re G.L.*, 2021-Ohio-2273, at ¶ 44. The best interest determination is reviewed under an abuse of discretion standard. *Id.,* citing *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 60. We have found that, "'[a] trial court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion.'" *Id.*, quoting *In re N.B.,* 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 60.

{¶ 37} The factors to be considered when determining the best interest of the child are listed in R.C. 2151.414(D)(1), including

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child * * *;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 38} The juvenile court is granted considerable discretion in weighing these factors. *In re D.A.* at ¶ 57. While each factor is to be considered, "'there is not one element that is given greater weight than the others pursuant to the statute.'" *In re G.L.* at ¶ 46, quoting *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Furthermore, "'[R.C. 2151.414(D)(1)] requires a weighing of all the relevant factors * * * [and] requires the court to find the best option for the child * * *.'" *Id.*, quoting *Schaefer* at ¶ 64.

{¶ 39} Additionally, the Supreme Court has held that R.C. 2151.414(D)(1) "does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re G.L.*, 2021-Ohio-2273, at ¶ 47, citing *In re A.M.*, Slip Opinion No. 2020-Ohio-5102, ¶ 31. The court found that a reviewing court "must be able to discern from the magistrate or juvenile court's decision, and the court's judgment entry," that the court considered the listed factors. *Id.* However, we cannot "graft onto the statute a requirement that the court include in its decision a written discussion of or express findings regarding each of the best-interest factors." *Id.,* citing *In re A.M.* at ¶ 31.

**{¶ 40}** In the journalized entry, the juvenile court found that permanent custody was in the best interest of the children and noted that it had reviewed all of the relevant statutory considerations, noting that

> the most significant factors in the Court's decision are the recommendation of the GAL/Attorney for the children, the wishes of the children * * * and the custodial history and that this is the second agency case for this family.

**{¶ 41}** The GAL recommended permanent custody for the children, noting H.B. and N.G. were well adjusted and bonded in their foster placement. The trial court also made note that the family had been involved with the agency for a long period of time, with the older children having a five-year history with the agency and the two younger children in custody two and a half years.

**{¶ 42}** A review of the record supports the juvenile court's best-interest findings. The testimony established that subsection (a), the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents was met. H.B. and N.G. are well bonded with their foster mother. Further, H.B.'s and N.G.'s foster mother and J.L. and J.G.'s caregiver ensure that the siblings continue to interact. Under subsection (b), the wishes of the child, although H.B. did not verbally express an opinion, N.G. believed the foster home was her forever home and that she was adopted long ago. Further the GAL recommended that permanent custody was in the best interest of the children, and that the foster placement was a good one. Under subsection (c), the custodial history of the children, the record unequivocally established that H.B. and N.G. were in the

temporary custody of CCDCFS for twelve or more months of a consecutive twenty-two-month period.

{¶ 43} Under subsection (d), the child's need for a legally secure placement and whether that could be achieved without a grant of permanent custody, the record established that Mother failed to consistently satisfy the case-plan objectives to resume custody of the children. In addition, no relative was presented as an option to care for the children. Given the foregoing, the children's need for a legally secure placement could only be achieved by granting permanent custody to CCDCFS. Under subsection (e), whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply, we find many of the juvenile court's findings previously discussed satisfy the best interest considerations.

{¶ 44} Our review of the record reflects that the best interest factors that the juvenile court must consider under the second prong were contained in the record.

{¶ 45} Mother argues that she substantially complied with her case-plan objectives and that there was no reason why the children could not be placed with her. Mother suggests the fact that she retains custody of her youngest child with protective supervision shows that the remaining four children should be returned to her custody. However, that fact is not a statutory factor required for consideration.

{¶ 46} Green specifically testified that even with only one child, Mother was inconsistent in her follow through on basic services. Mother's case manager, Charlene Edwards ("Edwards") testified that Mother would have good follow through on tasks for a period and then she would not hear from her for a couple of

weeks. Also, Mother consistently resisted efforts to reduce/eliminate her substance use. Mother reported that she had ceased taking medication for her mental-health issues, preferring to self-medicate with marijuana. Furthermore, at this point, the children have been in custody over two years and yet Mother has not completed all case-plan objectives.

{¶ 47} Based on the foregoing, we conclude the record contains competent, credible evidence from which the juvenile court could have found the essential statutory elements for an award of permanent custody were established. The juvenile court's decision to grant permanent custody of H.B. and N.G. to CCDCFS and the termination of Mother's parental rights was not an abuse of discretion.

{¶ 48} Accordingly, we overrule Mother's first assignment of error.

**Legal Custody of J.G. and J.L. to M.L.**

{¶ 49} We now turn to the juvenile court's grant of legal custody of J.G. and J.L. to M.L., J.L.'s paternal grandmother. We are again mindful of the broad discretion granted to the juvenile court in making custody decisions. *In re A.B.*, 8th Dist. Cuyahoga No. 110145, 2021-Ohio-4613, at ¶ 28, citing *In re E.A.*, 8th Dist. Cuyahoga No. 99065, 2013-Ohio-1193, ¶ 10, quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Similarly to a juvenile court's grant of permanent custody, we will not disturb a decision granting legal custody absent a finding of an abuse of discretion. *Id.*, citing *E.A.*, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1998).

**{¶ 50}** While we recognize that "parents have a constitutionally protected interest in raising their children," that interest is always subject to what is in the best interest of the child. *In re N.N.*, 8th Dist. Cuyahoga No. 110443, 2021-Ohio-3931, ¶ 16, citing *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 14-15, citing *In re B.L.,* 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 7.

**{¶ 51}** In a legal custody determination, "despite losing legal custody of a child, the parent of the child retains residual parental rights, privileges and responsibilities." *In re A.B.*, quoting *In re N.N.* at ¶ 19, citing *In re G.M.*, 8th Dist. Cuyahoga No. 95410, 2011-Ohio-4090, ¶ 14. A parent also retains the ability to regain custody of their children. *Id.* These retained rights give rise to a lesser standard of review in legal custody cases whereby the juvenile court makes its decision based on a preponderance of the evidence. *Id.*, citing *In re M.J.M.* at ¶ 9. "Preponderance of the evidence" is "'evidence that's more probable, more persuasive, or of greater probative value.'" *Id.*, citing *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7, quoting *In re D.P.*, 10th Dist. Franklin No. 05AP-117, 2005-Ohio-5097, ¶ 52, quoting *State v. Finkes*, 10th Dist. Franklin No. 01AP-310, 2002-Ohio-1439.

**{¶ 52}** R.C. 2151.353(A)(3) provides that the juvenile court "shall" award legal custody when an appropriate motion is filed and "only if the person identified signs a statement of understanding for legal custody that contains at least the following provisions":

(a) That it is the intent of the person to become the legal custodian of the child and the person is able to assume legal responsibility for the care and supervision of the child;

(b) That the person understands that legal custody of the child in question is intended to be permanent in nature and that the person will be responsible as the custodian for the child until the child reaches the age of majority. Responsibility as custodian for the child shall continue beyond the age of majority if, at the time the child reaches the age of majority, the child is pursuing a diploma granted by the board of education or other governing authority, successful completion of the curriculum of any high school, successful completion of an individualized education program developed for the student by any high school, or an age and schooling certificate. Responsibility beyond the age of majority shall terminate when the child ceases to continuously pursue such an education, completes such an education, or is excused from such an education under standards adopted by the state board of education, whichever occurs first.

(c) That the parents of the child have residual parental rights, privileges, and responsibilities, including, but not limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support;

(d) That the person understands that the person must be present in court for the dispositional hearing in order to affirm the person's intention to become legal custodian, to affirm that the person understands the effect of the custodianship before the court, and to answer any questions that the court or any parties to the case may have.

R.C. 2151.353(A)(3)(a)-(d).

{¶ 53} As required, M.L. signed an affidavit indicating her understanding of these requirements. Said affidavit was attached to the agency's motion to modify custody of J.G. and J.L. to legal custody to M.L. Further, the trial court reviewed the affidavit with M.L. during the trial and she reiterated her understanding of the role of legal guardian to the minor children.

{¶ 54} While we have noted that the legal custody statute, R.C. 2151.353(A)(3), "does not provide factors the court should consider in determining the child's best interest" we have found that the best interest factors governing permanent custody determinations are a helpful guide. *In re N.N.*, 2021-Ohio-3931, at ¶ 20, citing *In re G.M.*, 2011-Ohio-4090, at ¶ 15, and *In re E.A.*, 2013-Ohio-1193, at ¶ 13.

{¶ 55} As noted previously, the best interest factors under R.C. 2151.414(D) include, but are not limited to considering 1) the interaction and interrelationships of the child with the child's parents, siblings, relatives, and other people who may significantly affect the child; 2) the child's wishes for placement; 3) the child's custodial history; and 4) the child's need for a legally secure permanent placement. Additionally, our finding that the record supported the juvenile court's finding that permanent custody was in the best interest of the children, necessitates a similar finding here under the lesser standard of proof required for a legal custody case. As we have already noted, the children's caregivers maintain a good relationship such that the four siblings remain in contact. In addition, J.L. and J.G. have expressed a desire to remain with M.L. and are doing well in her care. The children also have a good relationship with their Mother, however, the length of placement outside of the home supports the juvenile court's finding that maintaining the placement of the children with M.L. is in their best interest.

{¶ 56} Mother argues that the juvenile court erred in finding legal custody to be in the best interest of the children because the court was required to make a

finding of parental unsuitability before it could give legal custody to a nonparent. Mother cites to *In re Perales*, 52 Ohio St.2d 89, 98, 369 N.E.2d 1047 (1997), in support of this argument. However, the Supreme Court also found that

> [W]e conclude, as the majority of appellate districts that have considered the issue have concluded, that when a juvenile court adjudicates a child to be abused, neglected, or dependent, it has no duty to make a separate finding at the dispositional hearing that a noncustodial parent is unsuitable before awarding legal custody to a nonparent.

*In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 24.

{¶ 57} As all the children were adjudicated dependent, the juvenile court was not required to make a finding of parental unsuitability before giving legal custody to M.L.

{¶ 58} Based on the foregoing, we conclude the record contains competent, credible evidence from which the juvenile court could have found legal custody was appropriate. The juvenile court's decision to grant legal custody of J.G. and J.L. to M.L. was not an abuse of discretion.

{¶ 59} Accordingly, we overrule Mother's second assignment of error.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

LISA B. FORBES, J., CONCURS;
FRANK DANIEL CELEBREZZE, III, P.J., CONCURS (WITH SEPARATE OPINION)

FRANK DANIEL CELEBREZZE, III, P.J., CONCURRING:

{¶ 61} I respectfully and fully concur with the entirety of the majority's opinion and resolution of this matter. These custody decisions are undoubtedly the most challenging and most important decisions we make as appellate judges.

{¶ 62} When reflecting upon our job and duty as appellate jurists, I cannot help but think of the song "Your Guardian Angel" by The Red Jumpsuit Apparatus. Our duty as jurists is to protect these children. During the more than two decades during which I have served as an appellate jurist and the eight years I served as a felony judge on the Cuyahoga County Court of Common Pleas, my top priority has been protecting children, women, and those who cannot protect themselves. This will continue to be my top priority as long as I am on the bench.

{¶ 63} I respectfully write separately to emphasize the gravity of protecting the five children and ensuring that the children — particularly J.G. and J.L. — continue to receive the treatment that they need.

{¶ 64} Green testified that J.G. has been diagnosed with PTSD and encopresis, a trauma-related disorder. (Tr. 78.) She has been receiving therapy through Ohio Guidestone for "years."

{¶ 65} Green testified that J.L. has been diagnosed with PTSD. He has been receiving services through Ohio Guidestone.

{¶ 66} The record reflects that Mother failed to appreciate the severity of J.G.'s and J.L.'s diagnoses. Green testified that Mother was "in denial" and "defensive" about J.G.'s PTSD and encopresis diagnoses. Mother did not believe that the diagnoses were "trauma-related," and she wanted to get a second opinion. (Tr. 79.) Green opined that Mother was more focused on blame-shifting — insisting that the children did not endure any trauma in her house — rather than focusing on how to help the children. (Tr. 80.)

{¶ 67} It is imperative that these children continue to receive the treatment that they all need. As the majority recognizes, J.G. and J.L. were present when J.L.'s father was murdered in Mother's home. The trauma related to this incident alone is unimaginable.

{¶ 68} Mother has been given every chance to make progress on her case plan, alleviate the concerns based upon which the children were removed from her custody, and demonstrate that she is willing and able to provide a safe, stable, and permanent home for these children. Unfortunately, Mother has continuously failed to take advantage of these opportunities. Having sat on *J.G. I*, 8th Dist. Cuyahoga No. 109357, 2020-Ohio-4304, in which this court reversed the trial court's

judgment awarding permanent custody of all four children to CCDCFS and remanded the matter to the trial court to reinstate temporary custody, I am stunned and disappointed that Mother failed to take advantage of the case planning services offered to her or the second chance she was given in September 2020.

{¶ 69} Mother continues to associate with dangerous and abusive individuals that have posed, and will continue to pose, a risk to the children's safety. There have been numerous incidents of domestic violence between Father and Mother — both before and after the agency became involved with the family in 2018.

{¶ 70} In *In re A.T.,* 8th Dist. Cuyahoga No. 110689, 2021-Ohio-4306, the appellant-mother's case plan "cited concerns regarding domestic violence between Mother and Father[.]" *Id.* at ¶ 6. At the time of the permanent custody hearing, the agency's two biggest concerns were parenting and domestic violence. The trial court granted permanent custody of the child to CCDCFS and terminated appellant's parental rights. *Id.* at ¶ 11. On appeal, this court reversed the trial court's judgment, concluding, in relevant part, that appellant "either completed or has taken significant steps toward completing all of her case plan objectives and all of the case plan services to which she was referred." *Id.* at ¶ 40. Appellant was referred for domestic violence services on two occasions. This court recognized that appellant completed the first domestic violence class and was engaged in counseling through the second referral at the time of trial. This court further explained,

> [t]he record reflects that [appellant] benefitted from her domestic violence programming. There was *no evidence of any contact between [appellant] and Father* during the six months between the December

2020 incident and the permanent custody hearing. There was no indication that [appellant] visited or attempted to visit Father in prison, nor that any correspondence was exchanged between them. [Appellant] expressed to [her CCDCFS social worker] in January 2021 that *she did not intend to speak to or remain involved with Father moving forward*. Furthermore, the record reflects that [appellant] *took affirmative steps to disassociate from Father by prosecuting abuse charges against him*.

Accordingly, the record reflects that [appellant] had taken significant steps towards completing her domestic violence objective and remedying this condition based upon which [the child] was initially removed. Furthermore, by ending the relationship with Father following the [most recent domestic violence incident], [appellant] demonstrated her commitment toward [the child] and her willingness to provide an adequate permanent home for the child.

(Emphasis added.) *Id.* at ¶ 76-77.

{¶ 71} In the instant matter, Mother's case plan included an objective for domestic violence based, in part, on the history of domestic violence between Mother and Father. (Tr. 51-52.) In my view, unlike *In re A.T.*, Mother failed to alleviate the domestic violence issue, failed to demonstrate her commitment to the children, and failed to demonstrate her willingness to provide an adequate, permanent home for the children. There have been multiple incidents of domestic violence between Mother and Father. However, Mother failed to take any affirmative steps to disassociate from Father. Despite having multiple opportunities to do so, Mother did not prosecute domestic violence charges against Father after CCDCFS became involved with the family in 2018.

{¶ 72} Unlike *In re A.T.*, there was evidence of an ongoing relationship between Mother and Father, which Mother unsuccessfully attempted to conceal

from the agency. Furthermore, Mother specifically expressed her intention of always being associated with Father.

{¶ 73} In addition to the extensive history of domestic violence between Mother and Father, Green testified at trial that Mother reported that she had been dating another individual, Joshua Jones, for three years. (Tr. 55.) Jones was incarcerated at the time of trial for a domestic violence offense committed against another woman, his "live-in girlfriend." (Tr. 58.) Mother conceded at trial that she brought the man that shot and killed J.L.'s father in front of J.G. and J.L. into her home. (Tr. 171.)

{¶ 74} In my view, Mother needs to reflect upon the totality of the horrific circumstances in this case. It is critical that Mother understands and appreciates that she is risking her own safety and well-being and, more importantly, the safety and well-being of the five children by associating with individuals with a propensity for violence. As an appellate jurist with more than 20 years of experience, a father, and a grandfather, I am extremely concerned about the violence these children have endured in the past, and may endure in the future, if Mother continues to surround herself with dangerous, violent, and abusive individuals.

{¶ 75} When considering the long history of this case for the five children (four of which are involved in this appeal) and the tumultuous, violent, and abusive relationship between Mother and Father, I again am reminded of a song by The Red Jumpsuit Apparatus — "Face Down." My greatest hope for Mother is that, like the woman in the song, she has finally reached the point where she has "had enough."

The vicious cycle has gone on for too long, and it is imperative that Mother break the cycle to prevent further pain and suffering to her and all five of her children.

{¶ 76} Mother's fifth child, N.B., is not involved in the appeal before this court. I urge Mother, however, to get on the right track so that N.B. does not experience the same trauma or violence endured by J.G., J.L., N.G., and H.B.

{¶ 77} Finally, with respect to J.G. and J.L., appellant retains residual parental rights, privileges, and responsibilities. *See In re C.L.*, 8th Dist. Cuyahoga No. 110363, 2021-Ohio-3819, ¶ 21. If Mother can get on the right track, and demonstrate that she is, in fact, willing and able to provide a safe, stable, and permanent home for J.G. and J.L., she can petition the juvenile court for a custody modification in the future. *In re T.R.*, 8th Dist. Cuyahoga No. 102071, 2015-Ohio-4177, ¶ 32, citing *In re L.D.*, 10th Dist. Franklin No. 12AP-985, 2013-Ohio-3214, ¶ 7, and *In re H.A.I.*, 8th Dist. Cuyahoga No. 97771, 2012-Ohio-3816, ¶ 36-37.